IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EMILY NEUMANN, BAILEY HUGHES, KATY FAIRCLOTH a/k/a KATY BROWN a/k/a KATY GLOECKNER, STEVEN MEYER, MARIANA KELM, ASHLEY MARTIN, JACQUELYNN CHARLES, MICHAEL ASBY, ADDIE ELDING a/k/a ADDISON WHITESIDES, LAUREN SHIPMAN-DORRANCE, WESLEY FISHER, and RYAN RUSCHHAUPT, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **CLASS ACTION COMPLAINT** |
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, d/b/a FedLoan Servicing, | ) ) ) ) ) | |
| Defendant. | ) | |

## <u>CLASS ACTION COMPLAINT</u>

The above captioned Plaintiffs, by their undersigned counsel, file this Class Action Complaint on behalf of themselves and all others similarly situated (the "Classes" as defined below) against the Pennsylvania Higher Education Assistance Agency d/b/a FedLoan Servicing ("PHEAA"). All allegations herein, other than those relating directly to Plaintiffs, are based on information and belief.

## INTRODUCTION

1.      This action seeks to protect teachers and public service workers, who despite being a vital centerpiece to the success of this country, are often underappreciated, undercompensated, and undervalued.

2.      The federal government provides financial assistance to students pursuing higher education under Title IV of the Higher Education Act ("HEA") of 1965, as amended. This assistance is designed to expand access to higher education.

3.      Consistent with the goals of HEA, the U.S. Department of Education ("Department") began originating student loans to borrowers under the William D. Ford Direct Student Loan ("Direct Loan") program in 1994.

4.      Recognizing the challenges that borrowers face when repaying these loans, Congress established the TEACH Grant program in 2007. *See* College Cost Reduction and Access Act ("CCRA"), 20 U.S.C. 1070 *et seq*.

5.      The TEACH Grant program provides financial grants to students who display "high academic aptitude," pursue teaching careers in low-income schools for at least 4 years, and teach subjects in high-need fields, such as math, science or foreign languages.

6.      In addition to the TEACH program, the federal government offers multiple Income Driven Repayment ("IDR") plans that help borrowers manage their debt. These plans include the Income-Contingent Repayment ("ICR") plan, the Income-Based Repayment ("IBR") plan, the Pay as You Earn Repayment plan ("PAYE"), and the Revised Pay as You Earn Repayment plan ("REPAYE").

7.    Upwards of one million students have taken advantage of these federal programs and have committed to public service jobs nationally.

8.    Unfortunately, despite their service to our communities, PHEAA deprives these teachers of their rights under the TEACH Grant program and the IDR plans, exposing them to financial ruin as a result.

9.    PHEAA is aware of these problems yet has failed to rectify them. Instead, PHEAA has consistently shifted the consequences of its flawed servicing system onto borrowers. The relief Plaintiffs seek is necessary to remedy borrower harm and to prevent future harms.

## JURISDICTION & VENUE

10.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a civil class action, the aggregate amount in controversy exceeds $5 million exclusive of interest and costs, and diversity of citizenship exists between Plaintiffs and PHEAA.

11.    Venue is proper because PHEAA regularly conducts business in this District and a substantial part of the events giving rise to the claims occurred here pursuant to 28 U.S.C. § 1391(b)(2).

12.    This Court has personal jurisdiction over PHEAA because PHEAA conducts business throughout the United States, including this District, has substantial contacts with this District, and has engaged in the illegal scheme explained herein that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business in this District.

13.     This Court has original jurisdiction pursuant to 28 U.S.C.A § 1331 and 18 U.S.C.A. § 1964(c).

14.     Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

### PLAINTIFFS

15.     Ashley Martin is an Arizona citizen, residing at 3137 W. Saint Anne Ave, Phoenix, Arizona 85041. Ms. Martin has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Martin has attempted to resolve the problem with PHEAA to no avail.

16.     Katy Faircloth (a/k/a Katy Brown; Katy Gloeckner) is an Iowa citizen, residing at 1109 SW Maple Street in Ankeny, Iowa 50023. Ms. Faircloth has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Faircloth has attempted to resolve the problem with PHEAA to no avail.

17.     Steven Meyer is a Tennessee citizen, residing at 606 Colonial Drive, Lexington, Tennessee 38351. Mr. Meyer has complied with all requirements of the TEACH Grant and his Agreement to Serve. Mr. Meyer has attempted to resolve the problem with PHEAA to no avail.

18.     Mariana Kelm is an Illinois citizen, residing at 1848 Butterfield Road, Woodstock, Illinois 60098. Ms. Kelm has complied and continues to comply with all

requirements of the TEACH Grant and her Agreement to Serve. Ms. Kelm has attempted to resolve the problem with PHEAA to no avail.

19.    Addie Elding (a/k/a Addison Whitesides) is a South Carolina citizen, residing at 1510 Hopewell Church Road, Blackstock, South Carolina 29014. Ms. Elding has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Elding has attempted to resolve the problem with PHEAA to no avail.

20.    Lauren Shipman-Dorrance is a Tennessee citizen, residing at 1202 Edgewood Place, Nashville, Tennessee 37206. Ms. Shipman-Dorrance has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Shipman-Dorrance has attempted to resolve the problem with PHEAA to no avail.

21.    Michael Asby is a Florida citizen, residing at 4170 Budd Road, New Smyrna Beach, Florida 32168. Mr. Asby has complied and continues to comply with all requirements of the TEACH Grant and his Agreement to Serve. Mr. Asby has attempted to resolve the problem with PHEAA to no avail.

22.    Jacquelynn Charles is an Illinois resident, residing at 3623 West Shakespeare Avenue, Chicago, Illinois 60647. Ms. Charles has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Charles has attempted to resolve the problem with PHEAA to no avail.

23.     Bailey Hughes is a Florida resident, residing at 4371 Lake Lucerne Cir., West Palm Beach, Florida 33409. Ms. Hughes has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Hughes has attempted to resolve the problem with PHEAA to no avail.

24.     Emily Neumann is a Texas citizen, residing at 12515 Barker Cypress 3206, Cypress, Texas 77429. Ms. Neumann has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Neumann has attempted to resolve the problem with PHEAA to no avail.

25.     Wesley Fisher is an Ohio citizen, residing at 8535 Evergreen Trail Apt. 206, Olmsted Township, Ohio 44138. Mr. Fisher has complied and continues to comply with all requirements of the TEACH Grant and his Agreement to Serve. Ms. Shipman-Dorrance has attempted to resolve the problem with PHEAA to no avail.

26.     Ryan Ruschhaupt is a California citizen, residing at 1642 East Autumn Sage Ave., Fresno, California 93730. Mr. Ruschhaupt has complied and continues to comply with all requirements of the TEACH Grant and his Agreement to Serve. Mr. Ruschhaupt has complied and continues to comply with all requirements of the IDR Plan, and has timely submitted his Annual Recertification Application each year. Mr. Ruschhaupt has attempted to resolve the problem with PHEAA to no avail.

**DEFENDANT**

27.     PHEAA was created in 1963 by the Pennsylvania General Assembly and is an independent political subdivision, which is self-described as a

governmental instrumentality, engaged in non-governmental commercial activity throughout the United States. PHEAA is engaged in nationwide commercial student-loan financial services. Upon information and belief, PHEAA is registered to do business in the state of Pennsylvania, entity number 619191. PHEAA is financially independent of the state of Pennsylvania, generates its own commercial revenue, and makes its own fiscal and policy decisions.

28.    PHEAA established FedLoan Servicing—which shares its headquarters with PHEAA at 1200 North Seventh Street, Harrisburg, Pennsylvania, 17102—to support the Department's ability to service student loans owned by the federal government.

## FACTUAL ALLEGATIONS

### TEACH GRANTS

29.    "The U.S. Department of Education estimates that our country will need approximately 430,000 new elementary and secondary teachers by the year 2020, particularly in high-need subject areas such as mathematics, science, and special education."[1]

30.    The TEACH Grant program was created to attract and retain qualified teachers for high-need subject areas at low-income schools.[2]

31.    A TEACH Grant assists students in paying for the cost of their education by providing grants of up to $4,000 per year to students who are

---

[1] U.S. Gov't Accountability Office, GAO-15-314, Higher Education: Better Management of Federal Grant and Loan Forgiveness Programs for Teachers Needed to Improve Participant Outcomes, 1 (2015) (hereinafter "GAO-15-314").
[2] *See* 20 U.S.C. § 1070g-2.

completing or plan to complete course work needed to begin a career in teaching and who agree to teach in a low-income school in a high-need field. Undergraduate students are eligible for a maximum of $16,000 in grants, while graduate students can receive up to $8,000 in TEACH Grants. As of 2015, more than $593 million in grants have been awarded since the start of the program.[3]

32.    High-need fields include bilingual education and English language acquisition, foreign language, mathematics, reading specialist, science, and special education, as well as any other field that has been identified as "high-need" by the federal government, a state government, or a local education agency, and that is included in the annual Teacher Shortage Area Nationwide Listing (Nationwide Listing).[4]

33.    In order to receive a TEACH Grant, individuals must sign a TEACH Grant Agreement to Serve, which sets forth the parties' rights and obligations under the TEACH Grant program.

34.    Pursuant to the TEACH Grant contract, individuals agree to teach:

(a)    in a high-need field;

(b)    at an elementary school, secondary school, or educational service agency that serves students from low-income families; and

---

[3] GAO-15-314.at pg.8.
[4] 20 U.S.C. § 1070g-2(b).

(c)    for at least four complete academic years within eight years after completing (or ceasing enrollment in) the course of study for which the grant was issued.[5]

35.    A copy of an Agreement to Serve is attached as Exhibit A.

36.    Additionally, participants must "submit evidence of such employment in the form of a certification by the chief administrative officer of the school upon completion of each year of such service."[6] ("certification paperwork").

37.    If a TEACH Grant recipient fails to satisfy his or her teaching obligation, that recipient's TEACH Grant is converted to an unsubsidized loan that the recipient must pay back, with capitalized interest accruing from the date the TEACH Grant was initially disbursed to that recipient.

## IDR PLANS

38.    PHEAA's contract with the Department also obligates it to help borrowers apply for and remain enrolled in a chosen IDR plan. Indeed, the Department obligates federal loan servicers, like PHEAA, to work alongside borrowers, helping them learn about, determine eligibility, and apply for IDR plans. The Student Aid Office explains:

(a)    "Why pay for help with your federal student loans when your loan servicer will help you for FREE? Contact your servicer to apply for income-driven repayment plans, student loan forgiveness, and more."[7]

---

[5] *Id.*
[6] *Id.* at § 1070g-2(b)(1)(D).
[7] *Income-Driven Plans*, Federal Student Aid, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven (last visited March 27, 2018).

(b)    "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these plans is right for you."[8]

(c)    "To apply, you must submit an application called the Income-Driven Repayment Plan Request…The application allows you to select an income-driven repayment plan by name, or to request that your loan servicer determine what income-driven plan or plans you qualify for, and to place you on the income-driven plan with the lowest monthly payment amount."[9]

39.    The IDR Request Form that borrowers must complete also instructs borrowers to contact their loan servicer: "If you need help with this form, contact your loan holder or servicer for free assistance."[10]

40.    Since at least 2015, the Department has emailed borrowers immediately after submitting an IDR Request Form, providing, "[i]f you have questions regarding the next steps in the processing of your application, or wish to cancel the application, contact your servicer(s)."

41.    From start to finish, making servicers available to borrowers during the IDR Request process is an important objective for the Department because some organizations offer these services for a fee. For example, the Student Aid Office website informs borrowers, "You Don't Have To Pay for Help With Your Student Loans[,]" instead directing borrowers to "take care of yourself for free by contacting

---

[8] *Id.*

[9] *Id.*

[10] A copy of the Income-Driven Repayment (IDR) Plan Request form can be found at: https://static.studentloans.gov/images/idrPreview.pdf (last accessed March 27, 2018).

your loan servicer" for help with a variety of services including, to "[c]hange your repayment plan" and "postpone monthly payments while you're furthering your education or are unemployed."[11]

42.     Similar to TEACH Grants, borrowers must recertify their eligibility for IDR every twelve months by submitting a new IDR Request Form.[12]

43.     According to the Student Aid Office, it should not take student loan servicers more than "a few weeks" to process a borrower's IDR Request Form.[13]

## PHEAA'S SERVICE OF TEACH GRANTS

44.     Student loan servicers are a crucial link between borrowers and lenders. Servicers—like PHEAA—manage borrowers' accounts, process monthly payments, manage enrollment in alternative repayment plans, and communicate directly with borrowers, including borrowers in distress.

45.     The federal government contracts with PHEAA to assist in administering TEACH Grants. PHEAA administers the TEACH Grants and handles payments, billing, and communications with the recipients. PHEAA's

---

[11] *See Avoid Scams*, Federal Student Aid Office (available at https://studentaid.ed.gov/sa/types/scams#dont-pay-for-help (last accessed March 27, 2018).

[12] The Student Aid Office explains, "[t]o recertify, you must submit a new Income-Driven Repayment Plan Request. You'll be asked to select the reason for submitting the application. Respond that you are submitting documentation of your income for the annual recalculation of your payment amount." Borrowers may also use the recertification process to switch IDR plans. *See Income-Driven Repayment Plans: Questions and Answers*, Federal Student Aid Office, p. 20 (available at https://studentaid.ed.gov/sa/sites/default/files/income-driven-repayment-q-and-a.pdf) (last accessed March 27, 2018).

[13] *Id.* at 22.

duties also include reminding TEACH Grant recipients when their paperwork is due.

46.     PHEAA can initiate the conversion of a grant to a loan. Almost all TEACH Grants—including all of the unsubsidized, interest-bearing loans at issue here—are administered by PHEAA.

47.     Despite taking on this substantial responsibility and obligation, PHEAA has failed to perform its duties as a loan servicer and to honor its obligations under the TEACH Grant program.

48.     Among other things, PHEAA fails to communicate with TEACH Grant recipients, fails to notify recipients about their certification paperwork, and fails to determine whether grants should be converted to loans.

49.     Rather than honoring the TEACH Grants when teachers are complying with their obligations, PHEAA converts those grants into interest-bearing loans and refuses to reconvert the loan to a grant for those teachers holding up their end of the bargain. The conversion usually comes during the last two years of the teacher's four year obligation.

50.     Many loan servicers, like PHEAA, are compensated by receiving a percentage of the unpaid balances of the loans they service. By converting TEACH Grants to loans, PHEAA increases the unpaid balance of loans it services, thereby illegally increasing its own revenues at the expense of Plaintiffs and other Class members.

51.    PHEAA is paid $1.05 to service each borrower in TEACH Grant status and $2.85 for Grants that have been converted to loans and are in repayment. (See Exhibit B - Amended Servicing Contract).

52.    Thus, PHEAA is incentivized to deny Certification Forms and convert the Grants into loans, despite actual knowledge that these teachers are materially performing their obligation.

### PHEAA'S PATTERN AND PRACTICE OF IMPROPER CONVERSIONS

53.    A 2015 U.S. Government Accountability Office ("GAO") report that analyzed servicer data for TEACH Grants found that more than one-third of the recipients had their grants converted to interest-bearing loans.[14]

54.    As of September 2014, at least 2,252 grants were erroneously converted to loans.[15]

55.    PHEAA improperly converted TEACH Grants to loans where it had actual knowledge that the Grant recipient was materially performing their obligations, relying on hyper-technical mistakes in the recipient's yearly certification form or by not providing the Grant recipient with a yearly certification form.

56.    PHEAA commonly communicated with TEACH Grant recipients via U.S. Mail and electronic mail.

57.    Further, additional servicer errors for improperly converted grants include converting the grant to a loan before certification was due, arbitrarily

---

[14] GAO-15-314.
[15] *Id.*

setting a due date for the certification, failure to give the recipient 45 days from the first notice to certify, or a failure to give the recipient a full year from graduation to certify teaching.

58. A prime example of PHEAA's illegal loan conversion conduct occurred at an elementary school in Idaho where every TEACH Grant recipient had his or her grant converted to a loan. In a rural Idaho elementary school of 32 certified teachers, seven teachers had received the TEACH Grant. *All* seven of those "grants" have been converted to unsubsidized loans.[16]

59. "[The U.S. Department of] Education established a dispute process to address concerns about TEACH Grants converted to loans in error, however, GAO found that [the U.S. Department of] Education and the servicer provide incomplete and inconsistent information to recipients about the availability of and criteria for disputing conversions. This is inconsistent with federal internal control standards that highlight effective external communication."[17]

60. In March of 2018, the Department issued a new report with disturbing findings.[18]

---

[16] Jennifer Zamora, *Feds Unfairly Convert Teacher Grants to Loans*, Idahoednews.org, May 26, 2014, available at: http://www.idahoednews.org/voices/feds-unfairly-convert-grants-to-loans/ (last accessed March 27, 2018).

[17] GAO-15-314

[18] U.S. Department of Education, Office of Planning, Evaluation and Policy Development, Policy and Program Studies Service, *Study of the Teacher Education Assistance for Higher Education Assistance for College and Higher Education (TEACH) Grant Program*, Washington, DC, 2018, available at: https://www2.ed.gov/rschstat/eval/highered/teach-grant/final-report.pdf (last accessed March 29, 2018) (hereinafter "Department Report").

61.    Sadly, the Department's Report found that almost half of the TEACH Grant recipients said that the TEACH Grant was influential in their decision to pursue teaching as a career, and 58% said that TEACH Grant was influential in their decision to pursue teaching in a high-need field at a high-need school.

62.    According to the new Department Report, roughly 63% of TEACH Grant recipients have had their grants converted to loans.[19]

63.    These conversions occur despite the fact that 89% of Grant recipients intended to fulfill the requirements when they received the Grant.[20]

64.    The study also found nearly 33% of the Grant recipients whose Grants were converted expressed the belief that they met all requirements to maintain the Grant.[21]

65.    A separate independent study similarly found that nearly 40% of all students who have been awarded TEACH Grants have had their grants converted into loans.[22]

66.    This is not the first time that PHEAA has been accused of improperly servicing government loans. A False Claims Act case involves allegations that

---

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *See* Tamara Hiler and Lanae Erickson Hatalsky, *TEACH Grant Trap: Program to Encourage Young People to Teach Falls Short*, Third Way, Jan. 13, 2015, available at: http://www.thirdway.org/memo/teach-grant-trap-program-to-encourage-young-people-to-teach-falls-short.

PHEAA illegally inflating its loan portfolios to obtain higher subsidies from the federal government.[23]

### DEFENDANT'S FAILURE TO RECONVERT LOANS

67.    PHEAA further fails to provide any appropriate recourse for the victims of its erroneous conversions. Thus, Plaintiffs, and the other Class members are left with interest-bearing loans and no recourse.

68.    Although PHEAA supposedly provides a *de jure* appeal process, the *de facto* appeal process is nonexistent.

69.    PHEAA tells recipients that once a grant is converted to a loan, it cannot be reinstated as a grant. PHEAA fails to explain reasons that a conversion could be deemed erroneous, how the problem would be rectified, or the criteria considered in the adjudication process.

70.    Worse, despite continuing to teach in high-need fields at low-income schools, because of PHEAA's illegal conversion activities, Plaintiffs and the other Class members are now forced to make monthly payments on their converted loans or face wage garnishments, tax refund confiscation, and negative credit reporting consequences.

71.    Rather than service the TEACH Grants and adhere to the program, PHEAA is stifling the program's intent for its own economic interest and punishing teachers who continue to fulfill their TEACH Grant obligations.

---

[23]    *See U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014).

72.     Between the beginning of the TEACH Grant program in the 2008-2009 school year and October 2014, more than 112,000 students have received grants, and the number of students increased in the following years. However, after PHEAA began servicing the program in July 2013, participation in the program has been declining.

73.     For example, in 2012 there were 20,670 undergraduate participants. In 2014, there were 17,055 participants, marking a 3,615 or a 17% participant decrease. In 2012, there were 18,471 graduate participants. In 2014, there were 16,089 participants, marking a 2,382 or roughly a 13% participant decrease.[24]

74.     Plaintiffs and the other Class members are recipients of these TEACH Grants and agreed to fulfill their obligation to teach in these high-need fields at low-income schools. Plaintiffs and the other Class members fulfilled or are continuing to fulfill their teaching obligations.

75.     PHEAA's improper conversions of these grants to interest-bearing loans has devastating consequences for Plaintiffs and the other Class members, including significant monthly payments and negative impacts on credit history.

**PHEAA'S SERVICE OF IDR PLANS**

76.     Despite its contractual duties with the Department, PHEAA often takes far longer than they should to process IDR Request Forms, or processes them incorrectly and improperly, triggering devastating consequences to borrowers.

77.     PHEAA's backlog in processing IDR Request Forms has been widely reported. For example, The Washington Post wrote:

[16]*See* GAO-15-314 at pg. 14.

> Officials at the department say the majority of servicers are meeting or exceeding the target turnaround time of 15 days. However, FedLoan, which primarily handles borrowers seeking public service loan forgiveness, has a significant backlog[.][25]

78.     The Consumer Financial Protection Bureau ("CFPB") also reported on borrowers' complaints about processing backlogs.

> Over this reporting period, federal student loan borrowers submitted complaints when unable to enroll in an IDR plan several months after submitting an application. These borrowers reported processing delays and lost application documents, resulting in unnecessary forbearance and an inability to make qualified payments towards loan forgiveness. Some of these complaints suggest that servicing problems are preventing borrowers from making qualified payments in pursuit of Public Service Loan Forgiveness.[26]

79.     PHEAA is aware of, but has failed to rectify, these delays. Instead, PHEAA has consistently shifted the consequences of its failing service system onto borrowers, at its own financial gain.

80.     To accommodate its delayed and improper processing of IDR Request Forms, PHEAA puts borrowers' accounts into forbearance, or if the borrower is eligible, into grace status.

81.     Indeed, IDR Request Forms freely authorize PHEAA to put a borrower's accounts into "forbearance while processing [her] application[.]"

---

[25] Danielle Douglas-Gabriel, *Delays. Backlogs. Confusing applications. Obama's latest student loan plan is having growing pains*. Washington Post, Apr. 5, 2016 (available at https://www.washingtonpost.com/news/grade-point/wp/2016/04/05/delays-backlogs-confusing-applications-obamas-latest-student-loan-plan-is-having-growing-pains/?utm_term=.2e1bb3620545) (last accessed March 27, 2018)

[26] CFPB, *Annual Report of the Student Loan Ombudsman*, Oct. 2017 (available at http://files.consumerfinance.gov/f/documents/cfpb_annual_report_student-loan-ombudsman_2017.pdf) (last accessed March 27, 2018).

82.    During periods of forbearance or grace, a borrower's "loan payments are temporarily suspended or reduced."[27]

83.    Every forbearance or grace period has consequences.

84.    PHEAA has discretion to cap the number of months a borrower's Direct Loans and FFEL loans may be placed into forbearance.

85.    As a result, by placing a borrower's loan into forbearance when PHEAA's own mismanagement prevents it from processing IDR Request Forms correctly or timely, PHEAA exhausts the borrower's forbearance eligibility in the future, when she may actually need it.

86.    What's more, not only does PHEAA's mismanagement accelerate borrowers' exhaustion of their forbearance eligibility, it also prolongs their journey to loan forgiveness.

87.    Because neither forbearance nor grace is a qualifying repayment option, PHEAA's mismanagement deprives borrowers the opportunity to make Qualifying Payments under their chosen IDR plan or, if they are enrolled, the PSLF program.

88.    These borrowers, who include public service employees, low-income borrowers, and others suffering financial hardship, have lost months that would otherwise count towards achieving loan forgiveness, thus prolonging the life of their repayment obligations.

89.    By placing a borrower's loan into forbearance or grace against their

---

[27] Federal Student Aid: An Office of the U.S. Department of Education, *Glossary* (available at https://studentaid.ed.gov/sa/glossary#letter_f) (last accessed March 27, 2018).

will, PHEAA's mismanagement also blocks the Federal Interest Subsidy the Department otherwise pays on the borrower's behalf.

90.    Except in some circumstances of Administrative Forbearance, PHEAA's forbearance-driven servicing model further injures borrowers by increasing their overall principal and monthly payment amount. The Student Aid Office explains,

> During forbearance, principal payments are postponed but interest continues to accrue. Unpaid interest that accrues during the forbearance will be added to the principal balance (capitalized) of your loan(s), increasing the total amount you owe.[28]

91.    Forbearance triggers the capitalization of not just the interest that accrues during the forbearance period, but all interest that has accrued over the life the loan.

92.    This capitalized interest is devastating, "potentially increasing loan balances by hundreds or even thousands of dollars."

93.    As a result of this change in principal, PHEAA's placement of a borrower's loan into forbearance also "may cause [her] monthly payment amount to increase."[29]

94.    Where PHEAA costs borrowers the advantage of Federal Interest Subsidies, or the opportunity to make Qualifying Payments toward loan forgiveness, PHEAA does not remedy their accounts. As a result, borrowers bear the

---

[28] *Id.*

[29] Federal Student Aid: An Office of the U.S. Department of Education, *Glossary* (available at https://studentaid.ed.gov/sa/glossary#letter_c) (last accessed March 27, 2018).

20

brunt of PHEAA's servicing failures.

95.    Meanwhile, PHEAA has saved untold sums of money by employing too few personnel to process its borrowers' IDR Request Forms and TEACH Grants timely and properly.

96.    PHEEA also appreciates a financial benefit in the form of interest subsidies and special allowances it receives for servicing FFEL loans.

97.    In addition to these immediate financial payouts, PHEAA's mismanagement described herein also pads the long-term accounts receivable of its balance sheet. Unless the Department transfers PHEAA's growing portfolio of 7.6 million borrowers to another servicer, PHEAA will profit on the backend of the FFEL and Direct Loans it detours into forbearance. This is because PHEAA will collect additional service fees to which it would not be entitled but for extending the life of borrowers' repayment period beyond the forgiveness schedules the IDR plans and PSLF program set.

98.    To this end, under their current contract, the Department pays PHEAA $2.85 per month to service a federal loan in repayment status, and $1.05 per month to service a federal loan in forbearance.

99.    PHEAA is aware of, but has failed to rectify, this mismanagement. Instead, PHEAA has consistently shifted the consequences of its failing service system onto borrowers, at its own financial gain. The relief Plaintiffs seek is necessary to remedy borrower harm and to prevent future harms.

## INDIVIDUAL PLAINTIFF ALLEGATIONS

### *TEACH Grants: Type 1 Conversions*

100.    The first type of conversion employed by PHEAA deals with the annual certifications that teachers submit to PHEAA. The requirements of the "annual certification" require each TEACH Grant recipient to "provide my TEACH Grant servicer with documentation of that service on a form that will be available from my TEACH Grant servicer. This documentation must be completed "every year." However, the terms "year" and "annual" are not defined. The annual certification language in the Agreement to Serve does not require the TEACH Grant recipient to submit "annual" certification within the "school year" as defined by the Agreement to Serve, but simply requires the "annual" certification to be completed "every year" after the completion of each school year. PHEAA arbitrarily created deadlines for these certifications and unscrupulously converted teacher's Grants because of a missed arbitrary deadline, despite the teachers continuing to teach in the targeted districts.

101.    PHEAA misrepresents that, in order for their Grant to remain a Grant, a teacher must:

(a)     Teach full-time as a highly-qualified teacher in a high-need field at an eligible low-income elementary school, secondary school, or educational service agency for at least 4 academic years.

(b)     Complete the required 4 years of teaching within 8 years of completing or otherwise leaving your TEACH Grant eligible program of study.

(c)    Meet all requirements for certifying that you are teaching or that you intend to satisfy your service obligation, as described in your Agreement to Serve (ATS). [30]

102.    Thus, PHEAA mispresents what must be done in order for the TEACH Grant to remain a grant and not be converted into a loan, as nowhere in the Agreement to Serve is there mention of these arbitrary deadlines—as explained above.

103.    Further, nowhere in the Agreement to Serve does it state that any minute variation in the certification form will result in a non-convertible, interest-bearing loan without any opportunity to correct a minor mistake.

104.    This failure to include language regarding the annual certification deadlines constitutes a material omission.

105.    These misrepresentations and omissions regarding the certification deadlines are a part of PHEAA's scheme to defraud.

***Plaintiff Ashley Martin***

106.    Ashley Martin received TEACH Grants in the 2010-2011 academic year in the amount of $2,000, 2011-2012 academic year in the amount of $4,000, 2012-2013 academic year in the amount of $4,000 in her undergraduate studies. In her graduate studies, Ms. Martin received grants in the academic years on 2013 and 2014 in the amount of $5,844.50.

---

[30]*See Special Programs, TEACH Overview* (available at: https://myfedloan.org/borrowers/special-programs/teach-grants/certification-form (last visited March 26, 2018).

107.    Ms. Martin provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

108.    Ms. Martin completed three years of her TEACH Grant obligations.

109.    Ms. Martin's grant was converted to an interest-bearing loan on June 30, 2017, when PHEAA misrepresented via correspondence that she had not complied with her teaching obligations.

110.    PHEAA claims that Ms. Martin's conversion was due to a missed signature on the certification form.

111.    Ms. Martin corrected the deficiency; however PHEAA refused to reconvert the loan back into a Grant.

112.    Despite having actual knowledge that Ms. Martin intended to and continues to fulfill her teaching obligations, PHEAA converted her Grant into a loan and refused to correct their error.

### Plaintiff Katy L. Faircloth (a/k/a Katy Brown, Katy Gloeckner)

113.    Katy Faircloth received TEACH Grants in 2009-2010 in the amount of $4,000 and 2010-2011 in the amount of $4,000.

114.    Ms. Faircloth provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

115.    On or about June 17, 2015, PHEAA sent Ms. Neumann a correspondence converting Ms. Faircloth's grant into an interest-bearing loan.

116.    Ms. Faircloth was 4 years into her obligations under the TEACH Grant, having previously completed 3 without issue.

117.    On or about June 17, 2015 PHEAA misrepresented that it did not receive certification paperwork within 30 days of the "due date."

118.    PHEAA informed Ms. Faircloth that there was no appeal process and no way to re-submit once the conversion to a loan occurred.

119.    PHEAA has cleared her electronic inbox, and therefore this information is not currently available to her.

120.    Despite having actual knowledge that Ms. Faircloth intended to and continued to fulfill her teaching obligations, PHEAA converted her Grant into a loan and refused to correct their error.

### Plaintiff Steven Meyer

121.    Steven Meyer received a TEACH Grant on or about February 16, 2010 in the amount of $3,000 and on or about August 30, 2010 in the amount of $4,000.

122.    Mr. Meyer graduated from his last eligible TEACH Grant program on July 30, 2011.

123.    PHEAA was informed of his graduation via a letter from Union University dated September 4, 2014.

124.    Mr. Meyer provided certification of employment within 120 days of completing his program for which he received the TEACH Grant.

125.    Mr. Meyer submitted the proper certification paperwork for four consecutive school years (2011-2012; 2012-2013; 2013-2014; 2014-2015).

126.    Mr. Meyer completed his obligations under the Grant, and PHEAA sent a correspondence on October 1, 2015 stating that he had satisfied his teaching

obligations under the Grant. A true and accurate copy of this letter is attached as Exhibit C.

127.    Less than one month later, PHEAA sent a letter misrepresenting that Mr. Meyer had one year of service obligations remaining.

128.    On or about April 12, 2017, PHEAA sent Mr. Meyer a correspondence stating that his Grants were converted into interest-bearing student loans.

129.    PHEAA informed Mr. Meyer of this conversion via a letter dated April 14, 2017, where PHEAA misrepresents that Mr. Meyer "did not take actions [he] agreed to in [his] Agreement to Serve." A true and accurate copy of this letter is attached as Exhibit D.

130.    Mr. Meyer then informed PHEAA of its mistake, but PHEAA has refused to recognize that Mr. Meyer has completed his obligations.

131.    Despite having actual knowledge that Mr. Meyer completed his teaching obligations, PHEAA converted his Grant into a loan and has refused to correct its error.

### Plaintiff Mariana Kelm

132.    Mariana Kelm received a TEACH Grant in 2009 and 2011.

133.    Ms. Kelm provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

134.    On or about October 24, 2014, PHEAA sent Ms. Kelm a correspondence stating it converted her TEACH Grant into an interest-bearing loan despite the fact

that she had sent her certification in June of 2014 the same way she had done the previous two years.

135.   PHEAA now claims that Ms. Kelm owes $10,586.93.

136.   Ms. Kelm called PHEAA to inform it of its error; however PHEAA refused to correct the error.

137.   Despite having actual knowledge that Ms. Kelm was continuing to fulfill her obligations under the TEACH Grant, PHEAA converted her grant into a loan and has refused to correct its error.

***Plaintiff Emily Neumann***

138.   Emily Neumann received a TEACH Grant in 2009-2010 in the amount of $4,000; 2010-2011 in the amount of $4,000; 2011-2012 in the amount of $4,000; and 2012-2013 in the amount of $3,000.

139.   Ms. Neumann provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

140.   On or about August 31, 2016, PHEAA sent Ms. Neumann a correspondence stating it converted Ms. Neumann's Grant into a loan—her fourth year into her teaching obligation.

141.   PHEAA converted the loan because of an alleged missed signature on the certification form.

142.   Ms. Neumann was never informed of these alleged deficiencies in her certification paperwork, despite PHEAA having her phone and email address— which PHEAA now uses to remind her to make payments on her loan.

143.   Despite having actual knowledge that Ms. Neumann was and is continuing to fulfill her obligations under the TEACH Grant, PHEAA converted her grant into a loan and has refused to correct its error.

***Plaintiff Lauren Shipman-Dorrance***

144.   Lauren Shipman-Dorrance received TEACH Grants in July and December of 2011.

145.   Ms. Shipman-Dorrance provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

146.   On or about May 19, 2017, PHEAA sent Ms. Shipman-Dorrance a correspondence stating it converted her Grant into an interest-bearing loan for an alleged failure to submit paperwork.

147.   Ms. Shipman-Dorrance took a leave of absence during the 2016-2017 school year.

148.   Ms. Shipman-Dorrance spoke with a customer service agent at PHEAA around October of 2016, who informed her that she could not submit certification paperwork until April of 2017.

149.   In early May of 2017, Ms. Shipman-Dorrance completed her final year of her obligation.

150.   She submitted her certification only to find out that her grants had been converted to loans.

151.   PHEAA has actual knowledge that Ms. Shipman-Dorrance completed her teaching obligations, however refuses to re-convert her loans into Grants.

### *Plaintiff Bailey Hughes*

152.    Bailey Hughes received a TEACH Grant in 2009-2010 in the amount of $2,000; in 2010-2011 in the amount of $4,000; 2011-2012 in the amount of $4,000; and in 2012-2013 in the amount of $4,000.

153.    Ms. Hughes provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

154.    On or about August 7, 2017, PHEAA sent Ms. Hughes a correspondence stating it converted Ms. Hughes' Grant into an interest-bearing loan for allegedly sending her certification forms one month passed an arbitrary "deadline" which would have been her fourth and final certification.

155.    Once Ms. Hughes' Grant was converted to a loan, she lost all access to any of the previous documents she had submitted.

156.    In August of 2017, Ms. Hughes spoke to a PHEAA employee who informed her verbally that there was no way to convert her loan back into a Grant.

157.    PHEAA had actual knowledge that Ms. Hughes completed her teaching obligations, however refuses to recognize that her Grants should be waived.

### *Plaintiff Jacquelynn Charles*

158.    Jacquelynn Charles received three TEACH Grants for $4,000 each.

159.    Ms. Charles provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

160. After teaching for two years pursuant to her TEACH Grant obligations, Ms. Charles' Grant was converted into a loan.

161. PHEAA claims that the Grant was converted due to a missed arbitrary "deadline."

162. Ms. Charles informed PHEAA that she was actively fulfilling her obligations and intended to continue to fulfill them via a letter dated December 11, 2013, attached as Exhibit E.

163. On or about August 13, 2014, PHEAA responded to this letter and informed Ms. Charles that her loans could not be reconverted back to Grants.

164. However, despite actual knowledge that Ms. Charles was fulfilling her obligations under the TEACH Grant, PHEAA converted her Grant into an interest-bearing loan and refuses to correct its error.

***Plaintiff Wesley Fisher***

165. Wesley Fisher received a TEACH Grants around September 14, 2010 in the amount of $4,000, September 12, 2011 in the amount of $4,000, and around August 1, 2012 in the amount of $4,000.

166. On or about February 9, 2018, PHEAA sent Mr. Fisher a correspondence stating it converted Mr. Fisher's TEACH Grants into interest-bearing loans.

167. PHEAA claims that Mr. Fisher failed to certify because he missed a signature on his certification page.

168.   PHEAA now claims he never completed a year of teaching, despite receiving multiple years of certifications.

169.   Further, PHEAA has refused to provide copies of the certifications in which there was an alleged missed signature.

170.   Mr. Fisher clarified the alleged deficiency; however PHEAA still refused to correct its error.

171.   Despite actual knowledge that Mr. Fisher was fulfilling his obligations under the TEACH Grant, PHEAA converted his Grant into an interest-bearing loan and refuses to correct its error.

### Plaintiff Ryan Ruschhaupt

172.   Ryan Ruschhaupt received TEACH Grants in 2013 in the amount of $1,931.10 and in 2014 in the amount of $2,317.50.

173.   Around December 2017, PHEAA sent Mr. Ruschhaupt correspondence stating it converted his Grant into an interest-bearing loan due to an alleged missed signature on the certification form.

174.   Mr. Ruschhaupt was only in his first year of his certification obligation.

175.   Mr. Ruschhaupt immediately resent the certification documents upon notice of the alleged noncompliance; however PHEAA refused to recognize that Mr. Ruschhaupt was continuing to fulfill his servicing obligations.

176.    Thus, despite actual knowledge that Mr. Ruschhaupt was continuing to fulfill his teaching obligations, PHEAA converted his Grant into an interest-bearing loan and refused to correct its error.

### TEACH Grants: Type 2 Conversions

177.    The second type of unlawful conversion is when PHEAA switches Plaintiffs to a "paperless" option without their knowledge. In certain cases, PHEAA would send correspondence by regular mail or personal email, but only send reminders about the yearly certification through this "paperless portal" without the teacher's knowledge and without notifying them. The Agreement to Serve states that these certification forms are to be available through the Department. In some cases, without the teacher's knowledge, PHEAA would switch from regular mailing or sending them to teachers via their personal emails of these forms to paperless mailing through PHEAA's "paperless portal." Thus, certain plaintiffs would receive no notification of the certification forms until after the form was already deemed late by PHEAA, resulting in the Grant being converted to a loan while the teachers continued to teach in the targeted districts.

178.    Thus, PHEAA makes a material omission when it fails to inform Plaintiffs and other Class Members that it is switching to a "paperless" option and this is a part of PHEAA's scheme to defraud.

### Plaintiff Addie Edling (a/k/a Addison Whitesides)

179.    Addie Edling received TEACH Grants on or about March 9, 2012 in the amount of $2,000; on or about August 13, 2012 in the amount of $4,000; on or about

August 13, 2013 in the amount of $3,760.00; and on or about August 19, 2014 in the amount of $3,964.40.

180.  Ms. Edling provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

181.  In 2016, Ms. Edling had a child and was on maternity leave until September 6, 2016.

182.  In August of 2016, Ms. Edling called PHEAA and told the TEACH Grant department that she was on maternity leave and would not return to work until September.

183.  Ms. Edling sent her certification when she returned to school in September of 2016.

184.  On or about November 16, 2016, PHEAA sent a letter to Ms. Edling stating that her TEACH Grants are now student loans. A true and accurate copy of this letter is attached as Exhibit F. In this letter, PHEAA misrepresents that Ms. Edling did not actively certify that she was teaching or intending to teach.

185.  PHEAA claimed there was an error with the paperwork, however failed to give her notice of this error.

186.  PHEAA claims it sent Ms. Edling notice of this error via her "paperless inbox."

187.  Ms. Edling did not have an online account with PHEAA and had previously received all notifications via regular mail.

188.   Ms. Edling sent a letter on March 10, 2017 appealing the decision to convert her TEACH Grant, along with a letter from the school principal, accompanied with proof of her maternity leave. These letters are attached as Exhibit G.

189.   On or about April 11, 2017, PHEAA sent a letter explaining to Ms. Edling stating "WE CANNOT CONVERT YOUR DIRECT UNSUBSIDIZED LOANS BACK TO TEACH GRANTS." This letter is attached as Exhibit H.

190.   Exhibit H misrepresents that PHEAA sent Ms. Edling any notice that her certification forms were incomplete. As explained above, Ms. Edling did not have an online account with PHEAA and could not have been sent any notification in September of 2016.

191.   Despite actual knowledge that Ms. Edling was completing her teaching obligations, PHEAA unscrupulously converted her Grant into an interest-bearing loan.

### Plaintiff Michael Asby

192.   Michael Asby received a TEACH Grant in 2009.

193.   Mr. Asby provided certification of employment within 120 days of completing his program for which he received the TEACH Grant.

194.   Mr. Asby was in his fourth year of his TEACH Grant teaching obligations when PHEAA converted his Grant into an interest-bearing loan.

195.   In November of 2016, PHEAA sent Mr. Asby a letter via regular mail stating that it had converted Mr. Asby's Grant into an interest-bearing loan.

196.   PHEAA claims that it converted Mr. Asby's Grant into a loan for a failure to provide a certification form.

197.   Mr. Asby had always received his certification forms via regular mail.

198.   Without approval or notification, PHEAA switched Mr. Asby to "paperless" and provided his certification forms via the online portal however used regular mail once the loan was converted.

199.   Mr. Asby then sent PHEAA a form stating that he was still fulfilling his teaching obligation.

200.   After three months, PHEAA responding stating that the decision was final and refused to correct its error.

201.   Despite actual knowledge that Mr. Asby was continuing to fulfill his TEACH Grant obligations, PHEAA converted Mr. Asby's Grant into a loan and refuses to correct its error.

### IDR Plans

**Plaintiff Ryan Ruschhaupt**

202.   On or about December 23, 2017, PHEAA sent Mr. Ruschhaupt a letter indicating that he must submit a recertification application by February 25, 2018 to remain enrolled in the REPAYE Repayment plan.

203.   Mr. Ruschhaupt submitted his Recertification Application on or about January 30, 2018—approximately one month before his deadline.

204.   Still, PHEAA failed to enroll Mr. Ruschhaupt in the REPAYE program.

205.   As a result, PHEAA denied Mr. Ruschhaupt the opportunity to make payments that count towards loan forgiveness, prolonging his repayment obligations as a result.

## CLASS ACTION ALLEGATIONS

206.   Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiffs bring this action on behalf of themselves and all others similarly situated. The classes are defined as :

> **The TEACH Class:** All persons in the United States who received a TEACH Grant serviced by PHEAA and who submitted documentation demonstrating that they either 1) are fulfilling their obligation; or 2) have fulfilled their obligation, yet had their grant converted to an interest-bearing loan from July 2013 to present.

> **The IDR Class:** All persons whose student loans were serviced by PHEAA and who enrolled or attempted to enroll in an IDR plan during the period of at least January 1, 2009 through the present (the "Class Period").[31]

207.   Excluded from the Classes are PHEAA and its past and present officers, directors, management, employees, subsidiaries or affiliates, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, any attorneys who enter their appearance in this action, and governmental entities not named in this lawsuit.

208.   Members of the classes are so numerous and geographically dispersed that joinder is impracticable. Plaintiffs believe there are thousands of members of

---

[31]   Plaintiffs have defined the Classes based on currently available information and reserve the right to amend their definition, including without limitation, the Class Period.

the Classes, if not more. Further, the Classes readily identifiable by objective means from information and records maintained by PHEAA.

209.  Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes were damaged by the same wrongful conduct of PHEAA. Plaintiffs' claims and claims of the putative Classes originate from the same fraudulent and unfair practices. If brought and prosecuted individually, the claims of each putative class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief. Plaintiffs would fairly and adequately protect the interests of the members of the putative class.

210.  PHEAA acted on grounds generally applicable to the entire Classes, therefore injunctive relief is appropriate. Such generally applicable conduct is inherent in PHEAA's wrongful conduct.

211.  Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members. Questions of law and fact common to the Classes include but are not limited to:

(a)  Whether PHEAA's conduct in fraudulently converting grants into interest-bearing loans violates the Racketeer Influenced Corrupt Organizations Act;

(b)  Whether PHEAA's conduct constitutes unjust enrichment;

(c)     Whether Plaintiffs and the Classes are entitled to recover compensatory, statutory, treble, and/or putative damages based on PHEAA's conduct alleged herein;

(d)     Whether PHEAA's contract with the Department of Education obligated it to inform borrowers in the IDR Class of IDR programs, assist with applications for IDR, and determine eligibility for IDR;

(e)     Whether the IDR Class was injured by being placed in forbearance rather than an IDR program;

(f)     Whether PHEAA places IDR Class borrowers' loans into forbearance to accommodate its own servicing delays and other mismanagement;

(g)     Whether Plaintiffs and the Classes were damaged by PHEAA's policies and practices alleged herein;

(h)     Whether Plaintiffs and the Classes are entitled to injunctive relief enjoining PHEAA from further engaging in unfair and deceptive practices alleged herein; and

(i)     Whether Plaintiffs and the putative Classes are entitled to recover attorney's fees.

212.    These and other questions of law and fact are common to the Classes and predominate over any questions affecting only individual Class Members, including legal and factual issues relating to liability and damages.

213.    PHEAA's conduct was generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

214.   This class action is superior to any alternatives for the fair and efficient adjudication of this controversy. There will be no material difficulty in the management of this action as a class action. Class treatment will also permit the adjudication of relatively small claims by Class Members who otherwise could not afford to litigate the claim, such as those asserted herein. Prosecution as a class action will eliminate the possibility of repetitive litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would produce.

215.   The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying judgments, establishing incompatible standards of law for PHEAA.

216.   Class action treatment also is superior to any alternative method to compensate the victims of PHEAA's unlawful conduct—Plaintiffs and the proposed Classes—for the injuries they have suffered as a direct result of Defendant PHEAA's conduct.

## CAUSES OF ACTION

### COUNT I

### *RICO § 1962(c) – Conversion Plaintiffs v. PHEAA Only*

217.   Plaintiffs incorporate and re-allege all other paragraphs in this Complaint by reference as though fully rewritten herein.

218.    Defendant PHEAA is engaged in a systemic and deliberate effort to convert TEACH grants into interest-bearing loans. It is engaged in this scheme because those conversions earn PHEAA multiples times the income of simple grants. This scheme is so widespread that, as alleged earlier, some schools have nearly one third of their teaching staff affected. The prevalence of both the reports of this occurring, as well as the prevalence of PHEAA not re-converting TEACH grants back to grants upon receiving corrective information, makes it clear that PHEAA is purposefully and deliberately converting the grants into loans. It has a tremendous profit incentive (over 100% on the monthly fee alone) to convert these loans. Along with its conduct of failing to correct its errors, this provides the necessary foundation to find that it is acting with a purposeful scheme to defraud the teachers.

219.    This Count seeks liability for PHEAA alone.

220.    PHEAA is liable to Plaintiffs under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, ("RICO").

221.    The Department and PHEAA are a RICO **enterprise** as defined by 18 U.S.C. § 1961(4).

222.    PHEAA is engaged in and its activities affect interstate commerce.

223.    The Department is engaged in and its activities affect interstate commerce.

224.    PHEAA, and not the Department, is the "**culpable person**" as defined by 1961(3) because it is a nongovernmental entity capable of holding interest in property.

225.    PHEAA is associated with the RICO Enterprise.

226.    PHEAA did conduct and participate in the conduct of the Enterprise through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Plaintiffs by illegally converting their loans despite actual knowledge of substantial compliance.

227.    PHEAA or the Department induced Plaintiffs to enroll in TEACH Grants and then illegally and intentionally later converted Plaintiffs' Grants to interest-bearing loans due to minute and hyper technical reasons, arbitrary annual deadlines, and underhanded tactics like sending certification information via PHEAA's website so that Teachers would miss PHEAA's arbitrary deadlines.

228.    This pattern of racketeering activity affects the Department.

229.    Specifically, PHEAA committed mail fraud under 18 U.S.C.A. § 1341.

230.    PHEAA committed wire fraud under 18 U.S.C.A. § 1343.

231.    Mail fraud is a "racketeering activity" as defined by 18 U.S.C. 1961(1).

232.    Wire fraud is a "racketeering activity" as defined by 18 U.S.C. 1961(1).

233.    PHEAA made the false representations outlined in the general allegations and throughout this compliant.

234.    Defendants fraudulently converted each of Plaintiffs' individual TEACH Grants as described *supra.*

235.    PHEAA used U.S. Mail to further this fraudulent scheme.

236.    PHEAA used the internet, email, and telephones to further this fraudulent scheme.

237.    PHEAA's scheme to defraud consists of PHEAA knowingly converting TEACH Grants into loans despite actual knowledge that the Plaintiffs continue to fulfill their Qualifying Teaching requirements.

238.    This scheme also includes representing to Plaintiffs that PHEAA cannot convert their loans back into TEACH Grants and failing to offer any meaningful appeal process.

239.    This scheme includes the false representation that as a loan servicer, it will properly administer and evaluation certification forms.

240.    This scheme to defraud includes having Plaintiffs and other Class Members perform duties and take on obligations that are above and beyond their Agreements to Serve, all without consideration and without informing Plaintiffs and other Class Members of these additional obligations.

241.    This scheme to defraud also includes PHEAA representing to Plaintiffs that it cannot convert their loans back into TEACH Grants, even after Plaintiffs have fulfilled the obligations required of them in their agreement with the Department.

242.    Moreover, PHEAA was monetarily incentivized to make these illegal conversions in furtherance of its fraudulent scheme.

243.    The acts of fraudulently converting Plaintiffs', and thousands of other teachers' TEACH Grants into loans, set forth above, constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

244.    PHEAA did conduct and participate in the conduct of the Department's affairs through a pattern of racketeering activity by illegally converting their loans despite actual knowledge of substantial compliance.

245.    The acts of fraudulently converting Plaintiffs' and thousands of other teachers' TEACH Grants into loans constitutes collection of a racketeering activity pursuant to 18 U.S.C. § 1962(c), which encompasses mail and wire fraud.

246.    The scheme has been going on since 2013 and continues today.

247.    These illegal conversions constitute at least two predicate acts in an ongoing fraudulent scheme.

248.    Defendants are engaged in an open-ended scheme to fraudulently convert TEACH Grants into interest-bearing loans.

249.    The illegal conversion of TEACH Grants into loans is part of PHEAA's way of doing business.

250.    PHEAA continues to fraudulently convert TEACH Grants into interest-bearing loans.

251.    PHEAA has directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering described above in violation of 18 U.S.C. § 1962(c).

43

252.  Plaintiffs are each a "person" capable of holding a legal or beneficial interest in property.

253.  As a direct and proximate result of the PHEAA's racketeering activities, in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property because these Grants are now allegedly due and owing and have been accruing interest from when Plaintiffs signed the Agreement to Serve.

254.  Plaintiffs are entitled to damages, treble damages, punitive damages, attorney's fees, and costs for PHEAA's violations.

## COUNT II

### *Unjust Enrichment – The TEACH Class v. Defendant*

255.  Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

256.  PHEAA has been unjustly enriched by receiving increased profits based on increased outstanding loan balances at the expense of Plaintiffs and TEACH Class members.

257.  PHEAA has been unjustly enriched by gaining qualified teachers in high-need areas.

258.  PHEAA has been unjustly enriched by increasing its portfolio by illegally converting the TEACH Grants at the expense of the Teachers who are fulfilling their obligations.

259.    PHEAA has knowingly, improperly, and unreasonably received and retained a benefit to the detriment of Plaintiffs and Class members. PHEAA's retention of these profits is inequitable.

260.    As a proximate consequence of PHEAA's improper conduct, the Plaintiffs and Class members were injured. PHEAA has been unjustly enriched and retention of funds under these circumstances would be unjust without payment.

## COUNT III

### *Violation of Pennsylvania's Unfair Trade Practices Consumer Protection Law – All Plaintiffs v. PHEAA*

261.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

262.    Plaintiffs bring this claim individually and on behalf of the Classes.

263.    Plaintiffs and PHEAA are "persons" under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. § 201-1, *et seq*.

264.    PHEAA's student loan servicing business qualifies as a "trade" and "commerce," as the UTPCPL defines those terms. 73 P.S. § 201-2(3).

265.    The services Plaintiffs purchased are "services primarily for personal, family, or household purposes." 73 P.S. § 201-9.2.

266.    The UTPCPL declares as unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 21 of this act." 73 P.S. § 201-3.

267. Under clause (4), unfair methods of competition and unfair or deceptive acts or practices are defined as "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

268. PHEAA violated the UTPCPL by engaging in fraudulent and deceptive conduct which created the likelihood of confusion and misunderstanding.

269. The facts described in the Factual Allegations in this Complaint constitute false and misleading practices.

270. Specifically, PHEAA's false and misleading acts and practices include:

(a)     Denying borrowers the opportunity to make Qualifying Payments for IDR forgiveness when it fails to timely and properly process IDR Request Forms, thereby extending the life of borrowers' loans;

(b)     Failing to properly count borrowers' IDR Qualifying Payments;

(c)     Exhausting borrowers' eligibility to request forbearance in the future, when they may actually need it;

(d)     Denying borrowers Federal Interest Subsidies the Department must make on their behalf;

(e)     Triggering the capitalization of borrowers' interest, thereby increasing borrowers' outstanding principal and monthly payment amounts; and

(f)     Collecting amounts not legitimately due and owing and failing to refund them to borrowers.

(g)     Improperly converting TEACH Grants despite actual knowledge

that Plaintiffs are fulfilling their teaching obligations.

(h)    Failing to reconvert the loans back to Grants despite knowledge that teachers are continuing to fulfilling their teaching obligations.

(i)    Collecting or attempting to collect on these improperly converted TEACH Grants.

271.    Plaintiffs and all class members suffered ascertainable losses that necessarily flowed directly from PHEAA's fraud or deceit in mismanaging borrowers' IDR Request Forms, including an exhaustion of future forbearance eligibility, a loss of Qualifying Payment months under IDR, a denial of Federal Interest Subsidies, an increase in outstanding principal and monthly payment amounts, and the payment of sums not due but for PHEAA's misconduct.

272.    Plaintiffs and all class members suffered ascertainable losses that necessarily flowed directly from PHEAA's fraud or deceit in improperly converting Plaintiffs' and class members' TEACH Grants, including the principal balance of the converted TEACH Grant, interest collected from the disbursement of the TEACH Grant, and the payment of sums not due but for PHEAA's misconduct.

273.    Plaintiffs and all class members justifiably relied on PHEAA's knowingly false representations that its management of their loans was proper when, in fact, PHEAA's management decisions were intended to accommodate its own interests, only, as a means of covering up its mismanagement and negligence, breaching PHEAA's duties under its contract with the Department and to borrowers.

274.   Plaintiffs and class members justifiably relied on PHEAA's knowingly false representation that PHEAA would properly service their TEACH Grants, and that the Grants would be waived upon completion of the teaching obligations.

275.   PHEAA's conduct in this regard was intentional, wrongful, reckless, and outrageous, and PHEAA knew or should have known it was committing unfair and deceptive acts and practices in violation of the UTPCPL.

276.   Based on the forgoing, PHEAA also violated the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), *see* 73 Pa. Stat. Ann. § 2270.5(a), by engaging in false, deceptive, and misleading representations and means, and unfair and unconscionable means in connection with the collection of alleged debts. *See* 73 Pa. Stat. Ann. § 2270.4(b)(5) and (6).

277.   PHEAA is a "creditor" and Plaintiffs are "consumers" under the FCEUA. *See* 73 Pa. Stat. Ann. § 2270.3.

278.   Plaintiffs have suffered ascertainable loss as a result of PHEAA's violations of the FCEUA, which constitutes a violation of the UTPCPL.

279.   Accordingly, Plaintiffs and individual class members are entitled to recover actual damages, punitive damages, statutory damages, treble damages, costs and reasonable attorneys' fees, and/or other additional relief as the Court deems necessary or proper.

## COUNT IV

### *Breach of Contract Injuring Third-Party Intended Beneficiaries – All Plaintiffs v. PHEAA*

280.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

281.    The Department and PHEAA entered into a servicing contract whereby PHEAA is contractually responsible for servicing federal student loans and grants taken out by Plaintiffs and the class members. The contract expounds that "[w]ith the sudden increase in current and potential loan volume that the Department will be responsible for servicing, the need for increasing the Title IV student aid servicing vehicles is…appropriate at this time."[32]

282.    As part of its contractual duties, PHEAA is obligated to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt." This includes "collection and default aversion activity on loans serviced under this contract as long as the loan remains on the servicer's systems."[33] In the supplemental additions to the Servicing Contract, the Government makes clear its goal to "promote the reduction of loan delinquency across the entire period of vender performance."

---

[32]    *See* Solicitation/Contract/Order for Commercial Items, 19 (available at https://www2.ed.gov/policy/gen/leg/foia/contract/pheaa-061709.pdf) (last accessed March 27, 2018).

[33]    *Id.*

49

283.   PHEAA breached its contract with the Department by failing to properly service borrowers' federal student loans and instead, focusing on its own profits.

284.   PHEAA breached its contract with the Department by improperly converting Plaintiffs' and other Class Members' TEACH Grants.

285.   The Teachers were intended beneficiaries of the Agreement between PHEAA and the Department.

286.   PHEAA failed to service borrowers' federal student loans properly by delaying their enrollment in IDR when necessary to accommodate PHEAA's own mismanagement or otherwise in violation of PHEAA's duty to borrowers. By failing to process borrowers' IDR Request Forms timely and properly, PHEAA caused Plaintiffs and class members substantial, continuing harm. PHEAA's purpose in delaying Plaintiffs' enrollment in IDR was its own overall profit caused by limiting customer service expenses, and padding its long-term accounts receivable.

287.   PHEAA failed to service Plaintiffs' TEACH Grants by converting their Grants to loans through arbitrary deadlines for certification forms and underhanded practices of sneaking certification forms in the "paperless option."

288.   PHEAA also failed to service Plaintiffs' and other Class Members' TEACH Grants by failing to provide an adequate appeals process to contest the conversion of their Grants into loans.

289.   Plaintiffs and the class members are intended third-party beneficiaries under the Servicing Contract. The Department specifically contracts with PHEAA

for the purpose of servicing Plaintiffs and the Class Members' federal student loans. In the Master Promissory Note ("MPN"), the contract between the borrower and the Department, the Department states a third-party may service the loan and directs borrowers to their servicers for loan-related issues. Again, after the loan repayment period has begun, the Department directs borrowers to contact their loan servicers for information about repayment issues, including IDR options. Since at least 2015, if not earlier, the Department has issued the following instruction to borrowers after submitting an IDR Request Form: "If you have questions regarding the next steps in the processing of your application, or wish to cancel the application, contact your servicer(s)."

290.    Plaintiffs and the class members relied on the contract between the Department and PHEAA when pursuing the repayment of their loans. Plaintiff and the class members' agreement with the Department, through the MPN, informed the classes of their rights to loan service and that third-party servicers would service their federal loans. Plaintiffs and the class members trusted and relied on PHEAA to adhere to its role as a servicer, including processing their IDR Request Forms timely and properly, and not push them into forbearance when PHEAA failed to do one or both.

291.    PHEAA's breaches cost borrowers significantly, including increasing the overall amounts borrowers have paid and owe on their loans, denying them the opportunity to take part in alternative repayment plans, delaying their opportunity to seek loan forgiveness, erasing reduced interest rates available to borrowers in

51

repayment, exhausting future forbearance eligibility, forgoing Federal Interest Subsidies from the Department, and the addition of unpaid interest to the principal balance of their loans, thus increasing borrowers' monthly payment amounts.

292.    The IDR Plaintiff and Class Members are intended third party beneficiaries under the Servicing Contract.

293.    The IDR Plaintiff and Class Members are required to send in annual certification forms to PHEAA. Further, all communications regarding the TEACH Grant are done through PHEAA.

294.    The IDR Plaintiff and Class Members and other Class Members relied on PHEAA to receive and properly review their certifications in order for their Grants to remain Grants and not be converted to interest-bearing loans.

295.    The IDR Plaintiff and Class Members and other Class Members were significantly harmed by PHEAA's breach, as they are now bridled with improper interest-bearing loans and being required to make payments when they rightfully should not be required to pay back these Grants.

296.    As a result of the foregoing, Plaintiffs and the class members are entitled to, among other things, compensatory damages and all other relief deemed just and equitable by the Court.

## COUNT V

### *Negligence – All Plaintiffs v. PHEAA*

297.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

298.    PHEAA owed—and continues to owe—a duty to Plaintiffs and the Classes to use reasonable care in assisting student loan borrowers in choosing between repayment options and processing their IDR Request Forms correctly and on time.

299.    PHEAA owed—and continues to owe—a duty to Plaintiffs to use reasonable care in assisting Plaintiffs submit their certification forms and a duty to properly review those forms and administer the TEACH Grants.

300.    This duty arises from several sources, including, but not limited to, the sources described below and is independent of any duty PHEAA owed as a result of contracts between it and Plaintiffs and the class members.

301.    PHEAA has a common law duty to prevent the foreseeable risk of harm to others, including Plaintiffs and the Class. Plaintiffs have multiple student loans held by the Department. The Department has contracted with PHEAA to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt."

302.    "With the sudden increase in current and potential loan volume" that PHEAA would be responsible for after executing its contract with the Department, it was foreseeable that, if reasonable measures were not taken, PHEAA would not be able to process Plaintiff's and the class members' IDR Request Forms correctly and on time. It was also foreseeable to PHEAA that injury would result from a failure to use reasonable measures to process borrowers' IDR Request Forms

correctly and on time. To this end, it was foreseeable that if reasonable measures were not so taken, PHEAA's servicing failures would exhaust borrowers' future forbearance eligibility, block the Department from paying Federal Interest Subsidies borrowers are entitled, deny borrowers the opportunity to participate in alternative payment plans, erase reduced interest rates available to borrowers in repayment, delay borrowers' opportunity to seek loan forgiveness, add to borrowers' principal loan balance, and increase their monthly loan payments.

303.   PHEAA assumed a duty to use reasonable measures in servicing loans for the more than 7.6 million borrowers in its portfolio.

304.   PHEAA assumed a duty to use reasonable measures in servicing the TEACH Grants on behalf of the federal government, including but not limited to having processes that ensure TEACH Grants were forgiven, having an appeals process whereby Plaintiffs who were fulfilling their obligations would not have their Grants converted, and having the resources to properly review and service the TEACH Grants.

305.   In addition to its general duty to exercise reasonable care, PHEAA also had a duty of care as a result of the special relationship that existed between PHEAA and Plaintiffs and the class members. The special relationship arose because the Department entrusted PHEAA to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt." Only PHEAA was in a position to ensure that its servicing systems were sufficient to

54

protect against the harm to Plaintiffs and the class members from PHEAA's insufficient servicing measures.

306.   PHEAA's duty to use reasonable care in servicing Plaintiff's and the class members' loans also arose under the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), *see* 73 Pa. Stat. Ann. § 2270.4(b)(5) and (6), which prohibits the "use [of] any false, deceptive or misleading representation or means in connection with the collection of any debt," as well as the "use [of] unfair or conscionable means to collect or attempt to collect any debt," including "[t]he collection of any amount, including interest, fee, charge or expense incidental to the principal obligation, unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

307.   Finally, PHEAA's duty to use reasonable care in servicing IDR Request Forms and TEACH Grant certifications arose not only as a result of the common law and the statutes described herein, but also because it was bound by, and had committed to comply with, industry standards, as represented by the Department to borrowers, as well as in the Department's contract for services with PHEAA.

308.   PHEAA breached its common law, statutory, and other duties and thus was negligent by failing to use reasonable measures to service Plaintiffs' and the class members' loans correctly and on time. Upon information and belief, the specific negligent acts and omissions committed by PHEAA include, but are not limited to, some, or all, of the following:

(a)   Denying borrowers the opportunity to make Qualifying

Payments for PSLF and IDR forgiveness when it fails to timely and properly process IDR Request Forms, thereby extending the life of borrowers' loans;

(b)    Failing to properly count borrowers' PSLF and IDR Qualifying Payments;

(c)    Exhausting borrowers' eligibility to request forbearance in the future, when they may actually need it;

(d)    Denying borrowers Federal Interest Subsidies the Department must make on their behalf;

(e)    Triggering the capitalization of borrowers' interest, thereby increasing borrowers' outstanding principal and monthly payment amounts;

(f)    Failing to educate borrowers about the consequences of switching repayment plans, including but not limited to borrowers having to choose between forbearance and the fixed, 10-year Standard Repayment Plan upon a change; and

(g)    Improperly converting TEACH Grants into interest-bearing loans, despite actual knowledge that the teachers were continuing to fulfill their teaching obligations.

(h)    Failing to acknowledge proper appeals and convert the loan back into a Grant when teachers demonstrate that they have been—and continue to—fulfill their teaching obligations.

(i)    Collecting amounts not legitimately due and owing and failing to refund them to borrowers.

309. In connection with the conduct described above, PHEAA acted wantonly, recklessly, and with complete disregard for the consequences.

310. As a direct and proximate result of PHEAA's negligent conduct, Plaintiffs and the Class Members have suffered substantial losses as detailed herein.

## COUNT VI

### *Declaratory Judgment – All Plaintiffs v. PHEAA*

311. Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

312. PHEAA's Servicing Contract with the Department requires it to provide adequate and proper services related to federal student loan servicing. These services include, among other things, assistance in educating borrowers about their repayment options and assisting borrowers in determining appropriate repayment plans, as well as understanding the consequences of switching between plans. Furthermore, PHEAA is compelled under the Servicing Contract to render these services without concerns of the cost, which the Department can manage by adjusting the number of borrowers assigned to various servicers.

313. Despite its obligations, PHEAA declined to fulfill its duties. Instead, PHEAA implemented an approach geared towards reducing its own costs while abandoning its role as a federal student loan servicer, a role that other servicers have adequately implemented.

314.   PHEAA, in the meantime and at the expense of Plaintiffs and the Class Members, has ballooned to become one of the largest federal student loan servicers in the country, servicing over a quarter of the $1.4 trillion in student loan debt owed by millions of borrowers across the United States, in part through its approach of reducing costs related to student loan servicing.

315.   Plaintiffs and the class members will continue to be harmed should PHEAA continue to implement its forced-forbearance approach while simultaneously asserting in public that it pursues the best repayment options for borrowers, as discussed above.

316.   Plaintiffs and the class members will continue to be harmed should PHEAA continue to implement its policy and practice of converting borrowers' loans to interest based loans, as discussed above.

317.   As a result of the foregoing, Plaintiffs and the class members are entitled to declaratory relief to prevent further harm. Namely, Plaintiffs and the class members are entitled to a declaration that PHEAA's conduct alleged herein is unlawful and an order enjoining PHEAA from continuing the unlawful practices alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and Class members pray that the Court:

(A)   Certify this action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appoint Plaintiffs as Class Representatives and its counsel of record as Class Counsel;

(B)    An order declaring PHEAA's conduct as alleged herein is unlawful;

(C)    An order enjoining PHEAA from continuing the unlawful practices alleged herein;

(D)    Enter judgment for the damages sustained by Plaintiffs and the Classes defined herein, and for any additional damages, and penalties and other monetary relief provided by applicable law, including treble damages, statutory damages and/or punitive damages;

(E)    For an order requiring PHEAA to institute a corrective review process to remedy PHEAA's wrongful conduct;

(F)    Award Plaintiffs and Class members pre-judgment and post-judgment interest as provided by law, including that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

(G)    Award Plaintiffs and Class members attorney's fees; and

(H)    Award such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully demands a jury trial on all matters so triable.

Respectfully submitted,

Dated: May 7, 2018

*/s/ Gary F. Lynch*
Gary F. Lynch (Pa. ID 56887)
Kevin W. Tucker (Pa. ID 312144)
**CARLSON LYNCH SWEET**
**KILPELA& CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
T. (412) 322-9243
glynch@carlsonlynch.com

59

ktucker@carlsonlynch.com

Troy J. Doucet
**DOUCET & ASSOCIATES CO., LPA**
700 Stonehenge Parkway, 2B
Dublin, Ohio 43017
(614) 944-5219 PH
(818) 638-5548 FAX
Troy@Doucet.Law

Bryan L. Bleichner
Gary K. Luloff
**CHESTNUT CAMBRONNE PA**
17 Washington Avenue North - Suite 300
Minneapolis, Minnesota 55401
T. (612) 339-7300
F. (612) 336-2940
bbleichner@chestnutcambronne.com
gluloff@chestnutcambronne.com

Brian C. Gudmundson
Michael J. Laird
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
T. (612) 341-0400
F. (612) 341-0844
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com

Arthur M. Murray
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100
Facsimile: (504) 584-5249
amurray@murray-lawfirm.com

Karen H. Riebel
Arielle S. Wagner
**LOCKRIDGE GRINDAL NAUEN
PLLP**
100 Washington Ave. S., Suite 2200

60

Minneapolis, MN 55401
T. (612) 339-6900
F. (612) 339-0981
khriebel@locklaw.com
aswagner@locklaw.com

*Counsel for Plaintiffs*